UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| WALKER SPECIALTY CONSTRUCTION, INC., <br><br> Plaintiff <br><br> v. <br><br> BOARD OF TRUSTEES OF THE CONSTRUCTION INDUSTRY AND LABORERS JOINT PENSION TRUST FOR SOUTHERN NEVADA, et al., <br><br> Defendants | Case No.: 2:23-cv-00281-APG-MDC <br><br> **Order Granting Plaintiff's Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment** <br><br> [ECF Nos. 20, 21] |

Under the Employee Retirement Income Security Act of 1974 (ERISA) and the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), an employer withdrawing from a multiemployer pension plan is liable for its share of the retirement fund's unfunded vested benefits. However, an employer is exempt from withdrawal liability, if (as relevant here) "substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry." 29 U.S.C. § 1383(b). This is known as the building and construction industry exception to withdrawal liability. The dispute in this case centers on the meaning of the term "building and construction industry."

Plaintiff Walker Specialty Construction, Inc. was a party to two labor agreements under which it was required to make contributions to a multiemployer pension plan operated by the defendants (the Trust). In 2019, Walker ceased operations in Nevada. In 2021, the Trust sent Walker a notice asserting that Walker owed $2,837,953 in withdrawal liability under the MPPAA. Walker requested review of that decision, citing the building and construction industry

exception to withdrawal liability because Walker performed asbestos removal, lead removal, and demolition work. The Trust denied Walker's request for review, concluding that Walker's work did not fall within the exception. Walker invoked the MPPAA's arbitration provision. The arbitrator determined that the exception did not apply. Walker then brought this suit under the MPPAA to vacate or modify the arbitration award. The parties now move for summary judgment on the issue of whether the exception applies.

     I grant Walker's motion and deny the Trust's motion because, reviewing de novo the meaning of the statutory term "building and construction industry," I conclude that the Trust and the arbitrator defined the term too narrowly and inconsistently with the relevant legislative history and case law. Once properly defined, Walker's work falls within the exception, so Walker does not have withdrawal liability. Consequently, I grant Walker's motion and order the Trust to return the partial payments that Walker has paid, with interest. I deny Walker's unsupported request for attorney's fees and costs without prejudice to Walker filing a proper request.

**I. BACKGROUND**

     Congress enacted ERISA "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Resilient Floor Covering Pension Tr. Fund v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1088 (9th Cir. 2015) (*Resilient Floor Covering*) (quotation omitted). "ERISA originally sought to accomplish this purpose by creating an insurance program for pension plans, administered by the Pension Benefit Guaranty Corporation ('PBGC')." *Id.* Congress enacted the MPPAA amendments to ERISA to address "the adverse consequences that resulted when individual employers terminated their participation in, or

withdrew from, multiemployer plans." *Id.* (simplified).  Specifically, the concern was that individual employers withdrawing from plans caused financial hardship on the remaining employers in the plan, ultimately resulting in plan terminations when too many employers left the plan, which in turn threatened the PBGC insurance program. *See id.*

Under the MPPAA, when an employer completely withdraws from a multiemployer pension plan, that employer must pay to the fund "a proportionate share of the fund's 'unfunded vested benefit liability.'" *Board of Trustees of W. Conf. of Teamsters Pension Tr. Fund v. Thompson Bldg. Materials, Inc.*, 749 F.2d 1396, 1399 (9th Cir. 1984) (citing 29 U.S.C. § 1381).  This is referred to as withdrawal liability. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 609 (1993).  Under 29 U.S.C. § 1383(b), an employer in "the building and construction industry" that entirely ceases operations in the relevant jurisdiction is not subject to this withdrawal liability "unless [it] resume[s] construction work within five years without also renewing [its] obligation to contribute to the plan." *Resilient Floor Covering*, 801 F.3d at 1089.  "The exception is rooted in the understanding that construction industry employers will come and go, but as long as the base of construction projects in the area covered by the plan continues funding the plan's obligations, the plan is not threatened by an individual employer's departure." *Id.* (simplified).  The plan can seek withdrawal contributions "only from those employers who may threaten the plan by reducing the plan's contribution base, that is, those employers who continue to do work in the area covered by the plan without contributing to it." *Id.* (quotation omitted).  The building and construction industry exception applies only if "substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry." 29 U.S.C. § 1383(b)(1)(A).

The plan sponsor (here, the Trust) determines the amount of the employer's withdrawal liability and notifies the employer of the amount owed, including a schedule of payments. 29 U.S.C. §§ 1382, 1399(b)(1). An employer may request the plan sponsor to review the determination of its liability. *Id.* § 1399(b)(2)(A). The plan sponsor must then resolve the challenge and give a basis for its decision. *Id.* § 1399(b)(2)(B). If the employer disagrees with the plan sponsor's decision, it may initiate arbitration under the MPPAA. *Id.* § 1401(a). The employer must make the scheduled payments even if it disputes the plan sponsor's decision, subject to adjustment after the arbitrator's decision. *Id.* §§ 1399(c)(2), 1401(d). After arbitration, any party may file suit in federal district court "to enforce, vacate, or modify the arbitrator's award." *Id.* § 1401(b)(2).

The parties followed the above process after Walker ceased operations in Nevada.[1] The Trust sent Walker a notice of withdrawal liability and demanded $2,837,953, to be paid in quarterly payments of $63,662. ECF No. 14 at 190. Walker requested the Trust review this decision, asserting that Walker is subject to the building and construction industry exception from withdrawal liability. *Id.* at 195-200. In its request for review, Walker contended that all its employees performed work in the building and construction industry because its employees performed on-site asbestos, lead, and mold abatement; demolition; and general contracting.[2] ECF No. 14 at 197, 280-82.

---

[1] The parties do not dispute that Walker has ceased operations in the relevant jurisdiction as the exception requires. ECF Nos. 20 at 5; 21 at 2.

[2] The parties agree that all of Walker's employees performed asbestos, lead, and mold abatement; demolition; and some minor general contracting, with most work consisting of asbestos abatement. ECF Nos. 20 at 5; 21 at 3. Consequently, the meaning of "substantially all" is not at issue in this case.

The Trust responded that Walker was not eligible for the exception. *Id.* at 296-98. Relying on a decision out of the Eighth Circuit and several district court decisions, the Trust construed the term "building and construction industry" to mean "the provision of labor whereby materials and constituent parts may be combined on the building site to form, make or build a structure." *Id.* at 296 (quoting *Union Asphalts & Roadoils, Inc. v. MO-KAN Teamsters Pension Fund*, 857 F.2d 1230, 1234 (8th Cir. 1988) (*MO-KAN*)). The Trust concluded that abatement and demolition do not fall within this definition because that work does "the opposite, namely tearing down structures rather than building or making them." *Id.* at 297.

Walker thereafter initiated arbitration. *Id.* at 300-11. In its letter initiating arbitration, Walker noted that the statute did not define "building and construction industry," but that legislative history suggested the courts should look to the meaning of the same language as developed in the administration of the Taft-Hartley Act. *Id.* at 303. Walker argued that when viewed through the lens of decisions issued by the National Labor Relations Board (NLRB) under the Taft-Hartley Act, the term is broader than the Trust's definition, to include a "wide variety of on-site work," including Walker's work. *Id.* at 304. The Trust responded that the arbitrator should not look to legislative history because Congress did not enact in the MPPAA a cross reference to the Taft-Hartley Act. *Id.* at 441-45. Instead, the Trust contended that the arbitrator should accept the definition the Eighth Circuit adopted in *MO-KAN*, which the Trust has consistently used over the years. *Id.* at 437-41.

The arbitrator ruled in the Trust's favor, holding that the "construction industry exception is to be construed narrowly" and the Trust's "determination is entitled to deference." ECF No. 1 at 9. The arbitrator also stated that Congress did not incorporate a cross reference to Taft-Hartley in the MPPAA, so Walker's "reliance on legislative history, which has never been

codified, and Taft-Hartley authority, is misplaced." *Id.* The arbitrator noted that Walker had not provided authority under the MPPAA that asbestos abatement and demolition qualified for the exception. *Id.* Consequently, the arbitrator adopted the Trust's definition and concluded that Walker's "work does not fit within that definition." *Id.* Walker sues to vacate or modify the arbitrator's decision.

## II. ANALYSIS

### A. Standard of Review

"[A]ny determination made by a plan sponsor" regarding withdrawal liability "is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). This means the employer bears the burden of disproving by a preponderance of the evidence the plan sponsor's factual determinations. *Concrete Pipe & Prods.*, 508 U.S. at 629. Additionally, the arbitrator's factual findings are presumptively correct, "rebuttable only by a clear preponderance of the evidence." 29 U.S.C. § 1401(c). However, conclusions of law are reviewed de novo. *Trustees of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 928-29 (9th Cir. 1986); *see also Thompson Bldg. Materials, Inc.*, 749 F.2d at 1405-06.

The parties agree there are no factual disputes about the work Walker's employees performed. *See* ECF Nos. 20 at 8; 21 at 2. The Trust argues that I should give deference to its decision because its findings regarding withdrawal are presumed correct under § 1401(a)(3)(A), the burden shifted to Walker to show the exception applies, and the arbitrator was required to assess the facts in light of a rebuttable presumption in the Trust's favor. The Trust also contends that Walker contractually agreed to be bound by the Trust's discretion in administering the pension trust, and the Trust has consistently applied its definition to other employers, so I should

6

defer to its decision. The Trust argues in its reply that whether asbestos abatement falls within the building and construction industry is a factual determination subject to deference to the Trust's finding, and that the arbitrator's ultimate determination of whether the exception applies is a mixed question of law and fact that should be reviewed for clear error.

Walker contends that the meaning of statutory language is a question of law that I review de novo. Walker argues that only the factual findings of the Trust and arbitrator are entitled to deference, but there are no disputed facts in this case. Walker asserts that the parties dispute the definition of a statutory term that would apply to all plans nationwide, not just the Trust, so the Trust's own legal interpretation is not entitled to deference. Additionally, Walker contends that if I am to afford deference on the question, it should be to the PBGC, which is the governing agency for the MPPAA, and the PBGC follows the legislative history's direction to look to how the term was defined in the administration of the Taft-Hartley Act. Walker contends that it did not contractually agree to be bound by the Trust's incorrect legal interpretations and the Trust has no written policy for its interpretation.

The proper interpretation of the statutory term "building and construction industry" is a question of law that I review de novo. The Trust misplaces its reliance on language in (1) an agreement between the contractors association and the union and (2) in the Restated and Amended Agreement and Declaration of Trust for the pension trust. The agreement between the contractors association and the union states that the contractors who sign it "agree to abide by [the Agreement and Declaration of Trust that established the pension fund] and by any rules and regulations or By-Laws adopted by the Trustees of the Fund." ECF No. 14-1 at 494, 523. An amendment to the Declaration of Trust for the pension trust states that the "Trustees have the exclusive rights, power and authority in their sole and absolute discretion, to administer, apply

7

and interpret the Trust Agreement, and Plan, rules, regulations or policies they adopt." *Id.* at 576. Neither contractual provision states that the signatories agree to be bound by the Trust's legal interpretations of statutory terms.

### B. Merits

The Trust argues that it has adopted the definition articulated in *MO-KAN* and other federal cases, and it has consistently used that definition over the years. The Trust contends that asbestos abatement and demolition do not combine materials to form or build a structure, but rather do the opposite by removing, tearing down, or destroying material. The Trust contends that Walker relies on legislative history in a committee report from 1980 suggesting that "building and construction industry" in the MPPAA be given the same meaning as has developed in the administration of the Taft-Hartley Act, and that Walker then relies on various NLRB rulings to support its position. The Trust contends that I should reject that approach because federal district courts have jurisdiction over MPPAA cases, not the NLRB. The Trust asserts that this one line in a committee report that was not enacted into law should not bind trusts and employers to every decision of the NLRB, which has no jurisdiction in MPPAA cases. The Trust notes that the NLRB is an administrative body that may change its position over time, but ERISA commands consistent interpretation of the law nationwide, so I should look to federal court decisions as the relevant precedent. Alternatively, the Trust argues that if I look to NLRB precedent, I should look only to NLRB decisions that pre-date the MPPAA. It also asserts that Taft-Hartley and MPPAA have different purposes, so terms in the two statutes should not necessarily be read the same. Additionally, it contends that the exception to withdrawal liability should be read narrowly, and Walker's arguments would expand the exception to nearly every employer who contributes to the fund.

Walker argues that I should look to the legislative history, as other federal courts (including *MO-KAN*) have, to conclude that "building and construction industry" in the MPPAA should be given the same meaning as the NLRB gave the term under the Taft-Hartley Act. Walker asserts that when viewing the relevant cases, the term is broader than the Trust's definition and includes Walker's on-site work that improved, repaired, or altered buildings and structures. Walker contends this is consistent with the reason that Congress enacted the building and construction industry exceptions in the MPPAA and the Taft-Hartley Act, which is related to the short-term nature of employment in the industry. Walker contends that other indicia support the conclusion that it is in the industry, including that it is licensed by the Nevada Contractor's Board, that the union has classifications for demolition and abatement work, and that the Occupational Safety and Health Administration regulates it and treats asbestos removal as construction activity.

The parties agree that the proper definition comes from the NLRB's decision in *Carpet, Linoleum, and Soft Tile Local Union No. 1247*, 156 N.L.R.B. 951, 959 (1966) (*Indio Paint*). There, the NLRB defined the term as "the provision of labor whereby materials and constituent parts may be combined on the building site to form, make or build a structure." *Id.* at 959 (emphasis omitted). Although the parties agree this is the definition, they dispute its scope. The Trust advocates for a literal approach and argues that because Walker's employees only remove or demolish structures, not combine them to make or build a structure, Walker is not in the building and construction industry. Walker argues that I must look to the entirety of *Indio Paint* and other relevant sources that show that the meaning is broader because it includes on-site additions, alterations, and repairs to buildings or structures, as shown by the various sources *Indio Paint* cites to develop its definition.

9

The MPPAA does not define the term "building and construction industry." Nor are there Supreme Court or Ninth Circuit cases interpreting it. I therefore turn to rules of statutory construction. "The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019) (quotation omitted). I begin with the statute's text and structure, giving terms their ordinary meaning at the time of enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. ----, 139 S. Ct. 2356, 2362, 2364 (2019). The statute's words "must be read in their context and with a view to their place in the overall statutory scheme." *Pac. Coast Fed'n*, 945 F.3d at 1083 (quotation omitted).

If the language's meaning is unambiguous, then I enforce it "according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010). Where the meaning is unclear, or where it is unclear whether certain activity falls within a statutory term, I "may [also] use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." *Pac. Coast Fed'n*, 945 F.3d at 1084.

The term "building and construction industry" is ambiguous as to what conduct constitutes work performed in that industry. Consequently, I turn to other sources, including legislative history, related statutes, the statute's purpose, and persuasive case law for guidance.

Congress stated in the legislative history that the term should "be given the same meaning as has developed in administration of the Taft-Hartley Act." H.R. Rep. No. 96-869, pt. 1, at 67, *reprinted* in 1980 U.S.C.C.A.N. 2918, 2944. Although the Trust contends, and the arbitrator agreed, that legislative history should not be consulted because the MPPAA does not contain an enacted cross reference to the Taft-Hartley Act, the cases the Trust relies on looked to that legislative history, including *MO-KAN*. *See MO-KAN*, 857 F.2d at 1234 ("Congress, in the

legislative history, indicated this term should be given the same meaning as has developed in the administration of the Taft-Hartley Act," so the Eighth Circuit "look[ed] to case law under section 8(f) of the Taft-Hartley Act, 29 U.S.C. § 158(f), which contains the same term.") (quotation omitted).[3] Additionally, the Trust relies on the definition the Eighth Circuit articulated in *MO-KAN*, but the Eighth Circuit derived that definition from the NLRB's *Indio Paint* decision. *Id.*

The PBGC also referenced that legislative history shortly after the MPPAA was enacted to give direction on how the term should be interpreted. *See* PBGC Opinion Letter 81-33, 1981 WL 17623, at *1 (Sept. 22, 1981) (stating that, given the direction in the legislative history, if the employer's activities are "encompassed by the term 'building and construction industry' under Taft-Hartley Act, then they would be similarly treated under ERISA"); PBGC Opinion Letter 82-9, 1982 WL 21109, at *1 (Mar. 26, 1982) (same). The PBGC has also turned to *Indio Paint* as a source for the term's meaning. *See* PBGC Opinion Letter 83-13, 1983 WL 22420, at *1 (June 10, 1983) (citing *Indio Paint*). The PBGC is "the federal agency responsible for interpreting ERISA." *Penn Cent. Corp. v. W. Conf. of Teamsters Pension Tr. Fund*, 75 F.3d 529, 534 (9th Cir. 1996). The Ninth Circuit has stated that it is "obligated to defer to the PBGC's interpretation even if reasonable minds could differ as to the proper interpretation of the statute." *Id.* (simplified). Consequently, although the PBGC never issued regulations regarding the term's meaning, its opinion—consistent with Congressional intent, that the term should be given the same meaning as has developed under Taft-Hartley—is additional persuasive authority that the term's meaning is determined through a review of NLRB's interpretation of that term, at least up

---

[3] *See also Cent. States, Se. & Sw. Areas Pension Fund v. Warner & Sons, Inc.*, No. 07-CV-4772, 2008 WL 4201014, at *3 (N.D. Ill. Sept. 9, 2008) (looking to legislative history); *Cent. States, Se. & Sw. Areas Pension Fund v. Waterland Trucking Serv., Inc.*, No. CIVA 06 C 4455, 2006 WL 4094350, at *3 (N.D. Ill. Dec. 22, 2006) (same).

until the MPPAA was enacted. As other courts and the PBGC have done, I look to the legislative history, and thus in turn to the Taft-Hartley Act and decisions thereunder.

Courts generally look to case law under section 8(f) of the Taft-Hartley Act, 29 U.S.C. § 158(f), to determine the term's meaning in § 1383(b) (and vice versa) because § 158(f) also contains the term "building and construction industry."[4] Section 158(f) "provides an exception to the general rule that an employer who signs a collective bargaining agreement with a union which does not represent a majority of the employer's present workforce commits an unfair labor practice and that such an agreement is void and unenforceable." *Operating Eng'rs Pension Tr. v. Beck Eng'g & Surveying Co.*, 746 F.2d 557, 562 (9th Cir. 1984). Such a pre-hire agreement is not an unfair labor practice if: (1) it covers "employees who are engaged in the building and construction industry;" (2) it is "with a labor organization of which building and construction employees are members;" and (3) it is "with an employer engaged primarily in the building and construction industry." *Id.*; *see also* 29 U.S.C. § 158(f).

---

[4] Although the two statutory sections address different subjects (unfair labor practices versus pension fund withdrawal liability), the practical reasons behind the building and construction industry exceptions in the statutes are similar. "In enacting the MPPAA, Congress recognized the transitory nature of contracts and employment in the building and construction industry." *Resilient Floor Covering*, 801 F.3d at 1089 (quotation omitted). The building and construction exception in the MPPAA "is rooted in the understanding that construction industry employers will come and go, but as long as the base of construction projects in the area covered by the plan continues funding the plan's obligations, the plan is not threatened by an individual employer's departure." *Id.* Likewise, in adopting § 158(f), Congress recognized that given the project-by-project nature of the construction industry, union "representation elections in a large segment of the industry are not feasible to demonstrate such majority status due to the short periods of actual employment by specific employers." *Operating Eng'rs Pension Tr. v. Beck Eng'g & Surveying Co.*, 746 F.2d 557, 562 (9th Cir. 1984) (quoting S. Rep. No. 86-187, pt. 1, at 55-56 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2373). Consequently, it makes sense that Congress referred courts to the Taft-Hartley Act when enacting the exception in the MPPAA, and that courts have read the two statutory terms to have the same meaning.

The NLRB addressed the meaning of the term "building and construction industry" under § 158(f) in *Indio Paint*, which predates the MPPAA. There, the NLRB's General Counsel charged a union with an unfair labor practice for having a pre-hire agreement with a flooring company. 156 N.L.R.B. at 953-54. The union contended that it was allowed to enter into a pre-hire agreement because the flooring company was primarily engaged in the building and construction industry. *Id.* To determine whether the flooring company, which both sold and installed flooring, was primarily engaged in the industry, the NLRB examined how to define the term. *Id.* at 957. First, the NLRB "presum[ed] that Congress used these terms in the traditional sense in which they are customarily used in common parlance as well as technical industrial parlance." *Id.* (simplified). The NLRB examined four resources to make that determination: (1) the *Construction Review* Volume 3 (1957 Supplement) published by the U.S. Departments of Commerce and Labor, (2) the Standard Industrial Classification Manual (1957) published by the Bureau of the Budget, (3) Webster's Third New International Dictionary, and (4) state caselaw. *Id.* at 957-59.

The *Construction Review* defined construction work as follows:

> Construction covers the erection, maintenance and repair (including replacement of integral parts), of immobile structures and utilities, together with service facilities which become integral parts of structures and are essential to their use for any general purpose. It includes structural additions and alterations. Structures include buildings . . . and all similar work which are built into or affixed to the land . . . . Construction covers those types of immobile equipment which, when installed, become an integral [sic] part of the structure and are necessary to any general use of the structure. This includes such service facilities as plumbing, heating, air-conditioning and lighting equipment . . . . In general, construction does not include the procurement of special purpose equipment designed to prepare the structure for a specific use.

*Id.* at 957-58 (emphasis omitted). The Standard Industrial Classification Manual defined construction as follows:

13

> The term "construction" includes new work, additions, alterations, and repairs. Three broad types of contract construction activity are covered; namely, (1) building and construction by general contractors [and] (3) construction by special trade contractors . . . .  General building contractors are primarily engaged in the construction of dwellings, office buildings, stores, farm buildings, and other projects of a similar character . . . .  Special trade contractors are primarily engaged in specialized construction activities such as plumbing, painting, electrical work, and carpentry.  General contractors in . . . the building field . . . usually assume responsibility for an entire construction project, but may subcontract to others those portions of the project requiring special skills or equipment.  Special trade contractors may work for general contractors under subcontracts [performing only part of the work covered by the general contract] or may work directly for the owner of the property . . . .  The installation of prefabricated building equipment and materials by general contractors and special trade contractors is classified in this division.  Similar installation work performed as a service incidental to sale by employees of an established manufacturing or selling prefabricated equipment and materials is classified according to the principal activity of the establishment.

*Id.* at 958 (emphasis omitted).  The NLRB also consulted other sources, such as Webster's Dictionary and judicially recognized definitions in several state court cases. *Id.* at 958-59.  The NLRB summarized these sources to provide a definition of the term as "the provision of labor whereby materials and constituent parts may be combined on the building site to form, make or build a structure." *Id.* at 959 (emphasis omitted).

The *Indio Paint* definition was a summary of the relevant authorities it reviewed, several of which included alterations and repairs, and must be considered in that context.  That approach is consistent with another pre-MPPAA decision issued by the NLRB.  In *Zidell Explorations, Inc.*, the NLRB concluded that a company that contracted with the U.S. Department of Defense to dismantle a ballistic missile complex was engaged in the building and construction industry within § 158(f)'s meaning. 175 N.L.R.B. 887, 888-89, 1969 WL 23759 (1969).  *Zidell* post-dates *Indio Paint*.  Yet the NLRB did not confine the "building and construction industry" to literal erecting of structures, and instead included dismantling of a missile base.

14

It is also consistent with the PBGC's understanding of the term shortly after the MPPAA was passed. In a 1983 Opinion Letter, the PBGC stated that its "understanding of the cases under the labor-management relations law is that the term 'building and construction industry' includes, *but is not necessarily limited to*, work performed at the site of a building or other structure in connection with the erection, alteration of the building or other structure." PBGC Opinion Letter 83-13 (emphasis added). And it is consistent with another provision in the Taft-Hartley Act that includes the term "construction industry." Section 158(e) provides another exception to an unfair labor practice for agreements between labor organizations and an employer "in the construction industry" relating to the "contracting or subcontracting of work to be done at the site of construction, alteration, painting, or repair of a building, structure, or other work." 29 U.S.C. § 158(e).[5]

After the MPAA's enactment, courts have understood the definition under § 158(f) and in the MPPAA to encompass more than just work that forms, makes, or builds a structure in the literal sense. For example, in *MO-KAN*, the Eighth Circuit found that an employer whose employees merely transported materials to the construction site did not fall within the MPPAA's building and construction industry exception. 857 F.2d at 1235. But in doing so, the Eighth Circuit cited the arbitrator's finding that the employees "did not engage in spreading road oil or asphalt on any highway or in any other way engage in actual road construction or repair." *Id.*

---

[5] Although I do not look to Nevada law to determine the meaning of a federal statutory term, I note that Nevada similarly describes a "builder" or "contractor" to include employees who "construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith." Nev. Rev. Stat. §§ 624.020(1)-(2). Walker had a license from the Nevada State Contractors Board under classifications A-23 (Removal of Asbestos) and A13 (Wrecking Buildings). ECF No. 14 at 30, 73-76.

The Eighth Circuit also cited to *Beck Engineering & Surveying Co.* as an example of when an employer is in the industry. *Id.* In *Beck*, the Ninth Circuit concluded that the building and construction industry exception in § 158(f) applied because "ninety percent of [the employer's] surveying work is related to proposed and ongoing construction projects and is performed in large part at the job site." 746 F.2d 557, 562 (9th Cir. 1984). Surveying work does not fit the Trust's interpretation of the term, yet the parties in that case and the Ninth Circuit agreed that it was within the industry. *Id.*; *see also Bay Area Sealers*, 251 N.L.R.B. 89, 120-21 (1980) (citing *Indio Paint* and finding that an employer who performed "repair work or resurfacing work . . . on highways, concrete floors, or paved areas generally, has conventionally been considered 'construction' work" under § 158(f)).[6]

This view is bolstered by the NLRB's post-MPPAA decision that asbestos removal is in the building and construction industry within § 158(f)'s meaning:

> It is evident that the asbestos removal activities in which Respondent is engaged affect the structure of buildings and equipment, such as boilers and pipes, which, after installation, have become an integral part of the structure, itself. Asbestos removal involves the alteration and repair of buildings and permanently attached fixtures and equipment. It is readily distinguishable from building maintenance and removal of waste. Respondent appears to concede that installation of insulation or reinsulation are building and construction industry activities. Logically, it follows that removal of one type of insulation, for which another type of insulation is to be substituted, is a necessary part of the overall insulation installation or reinsulation process. One essential part of the process is just as much a part of the construction industry as is the other. For purposes of the definition of the building and construction industry, as used in Section 8(f), removal and substitution are but two halves of the whole.

---

[6] *Bay Area Sealers*, which pre-dates the MPPAA by about a month and half, referred to a publication from the U.S. Department of Commerce, Bureau of the Census called the Census of Construction Industries (1972), which defined construction to include "the maintenance and repair of immobile structures . . ., including replacement of integral parts . . . ." 251 N.L.R.B. at 120-21.

16

*U.S. Abatement, Inc.*, 303 N.L.R.B. 451, 456 (1991).[7] In reaching this conclusion, the NLRB did not indicate it was adopting a new definition of the term or somehow departing from *Indio Paint*. The Trust cites more recent cases where withdrawal liability was imposed on asbestos companies, but the employers in those cases did not argue they were exempt under the building and construction industry exception, so the issue was not addressed. *See Gesualdi v. Nacirema Indus. Inc.*, No. CV-16-4159-DRH-ARL, 2017 WL 9487171 (E.D.N.Y. Aug. 31, 2017), *report and recommendation adopted*, No. 16-CV-04159-DRH-ARL, 2017 WL 4326049 (E.D.N.Y. Sept. 28, 2017); *New Jersey Carpenters Pension Fund v. Hous. Auth. & Urb. Dev. Agency of the City of Atl. City*, 68 F. Supp. 3d 545 (D. N.J. 2014).

The NLRB and courts have construed the term "building and construction industry" in § 158(f) "narrowly because, as in section 1383 of MPPAA, the term is part of a statutory exception." *MO-KAN*, 857 F.2d at 1234 (citing *Frick Co.*, 141 N.L.R.B. 1204, 1208 (1963) (stating that where Congress creates a statutory exception, it "will be strictly construed")); *see also Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan*, 891 F.3d 839, 845 (9th Cir. 2018) (stating that "because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans") (quotation omitted). But that does not mean that the term should be interpreted so narrowly as to exclude work that Congress intended be within the exception.

The work Walker performed was onsite alteration, demolition, repair, or improvement of fixed structures in buildings, such as "surfacing material, piping system insulation, roofing,

---

[7] *Cf. Subject: Devcon Sys. Corp.*, Opinion Letter, No. 21-CA-17530, 1979 WL 61549, at *2 (Apr. 30, 1979) (advice letter from the NLRB's Office of General Counsel finding that a company that installed fire protection equipment in new and existing structures was in the industry in part because "the employees are involved in the physical alteration of the building").

flooring, cement asbestos piping and shingles[,] . . . fireproofing materials," paint, and drywall. ECF No. 14 at 573-74, 577; *see also id.* at 854, 857, 862, 1280, 1304, 1371. Walker either removed the fixtures or parts of fixtures, or coated them with an emulsion to prevent asbestos fibers or lead-based paint from flaking off. *Id.* at 573-75, 578. Walker also engaged in demolition work related to remodeling or refurbishing of structures, or complete demolition of a structure "so that new structures can be built on the same job location." *Id.* at 576. By encapsulating and removing component parts of fixtures attached to buildings, and by demolishing buildings for future repair, remodeling, or construction, Walker engaged in work in the building and construction industry.[8]

I therefore grant Walker's motion and deny the Trust's motion. Additionally, I order the Trust to return to Walker the payments it has made thus far, with interest. *See* 29 C.F.R. § 4219.31(d). I deny Walker's unsupported request for attorney's fees and costs without prejudice to Walker filing a bill of costs and motion for attorney's fees under Federal Rule of Civil Procedure 54(d) and Local Rules 54-1 through 54-14.

**III. CONCLUSION**

I THEREFORE ORDER that the defendants' motion for summary judgment **(ECF No. 20) is DENIED**.

I FURTHER ORDER that the plaintiff's motion for summary judgment (ECF No. 21) **is GRANTED**.

---

[8] To the extent I should review the arbitrator's conclusion that Walker' work does not fall within the exception under a clearly erroneous standard as a mixed question of fact and law, I reach the same result. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prod.*, 508 U.S. at 622 (quotation omitted). Reviewing the relevant legal authority and the undisputed facts regarding the work Walker performed, I am left with the definite and firm conviction that a mistake has been committed.

I FURTHER ORDER that plaintiff Walker Specialty Construction, Inc. shall calculate the amount of overpayments and interest due through March 8, 2024, with a per diem amount of interest for every day after March 8, and provide it to the defendants.  If the parties agree, they will file a stipulation as to the amount by March 8, 2024.  If the parties do not agree, then by March 8, 2024, each may file a proposed amount, including a per diem amount of interest for each day after March 8, 2024.

DATED this 22nd day of February, 2024.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE